Filed 9/30/21  P. v. Lockett CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060404 |
| v. | (Super. Ct. No. C1498116) |
| JAMIE RAMONE LOCKETT, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Hector E. Ramon, Judge.  Affirmed and remanded for resentencing.

David L. Annicchiarico, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Rene A. Chacon and Linda M. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A lying-in-wait murder special circumstance is supported by substantial evidence when a defendant intentionally killed the victim, concealed his or her presence or purpose from the victim, watched and waited for an opportunity to act, and then made a surprise attack from a position of advantage. (See *People v. Stevens* (2007) 41 Cal.4th 182, 201-202 (*Stevens*); see also CALCRIM No. 728.)

Here, defendant Jamie Ramone Lockett and his friend Tyrone Fryman were arguing on a sidewalk in downtown San Jose late at night. Lockett walked around in a circle near Fryman and then turned away from him. Lockett then suddenly spun around and shot Fryman at close range with a concealed handgun. Lockett shot Fryman four more times as he lay on the ground, pulled a hood over his head, and ran away. As Fryman struggled and eventually got off the ground, he pulled out his own handgun and fired off an aimless shot. Fryman was transported to a hospital and died. The shooting was captured on nearby surveillance video cameras.

At a jury trial, the prosecution introduced several videos of the shooting, the testimony of an uninvolved eyewitness, and a video recovered from Lockett's cell phone showing him holding the suspected murder weapon (the gun video). Lockett testified he shot Fryman in self-defense. The jury found Lockett guilty of first degree premeditated murder. The jury also found true a lying-in-wait special circumstance allegation and a firearm enhancement. The trial court sentenced Lockett to prison for life without the possibility of parole, plus 28 consecutive years.

On appeal, Lockett argues insufficient evidence of lying in wait, the court erred by admitting the gun video, ineffective assistance of trial counsel, prosecutorial misconduct, cumulative prejudice, and the case should be remanded so the trial court can exercise its discretion to dismiss the firearm enhancement (formerly mandatory).

The Attorney General concedes the need for resentencing as to the firearm enhancement and we agree. In all other respects, we affirm the judgment.

2

# I

## STATEMENT OF FACTS AND THE CASE

On October 30, 2014, Fryman and Lockett were both in downtown San Jose late at night. Fryman was dressed in black; Lockett was dressed in white, including a distinctive white sweatshirt. At about 10:54 p.m., Lockett was seen walking with Fryman's cousin, L. Wood, in front of a check cashing store at the corner of Second Street and Fountain Alley.

At about 11:30 p.m., Wood was walking with Fryman. At about 11:32 p.m., Lockett walked southbound on Second Street and circled back northbound toward the area in front of the check cashing store. At about 11:34 p.m., Fryman and Lockett were arguing in front of the check cashing store, while standing a few feet from each other. Fryman was standing near his friend G. Pedrol, Wood, and another man.

While Lockett and Fryman were arguing, Lockett walked in a tight circle, turning his back towards Fryman. Lockett then suddenly spun around towards Fryman with a handgun in his right hand and shot Fryman in the torso. While Fryman was lying on the ground, Lockett shot him four more times; three of the shots entered Fryman's back. With his left hand, Lockett pulled his hoodie over his face and ran away.

As Fryman struggled to get up off the ground, he pulled a handgun from his right hip area and fired off one shot. Wood and another man helped pick up Fryman and ran with him until Fryman collapsed about a block away from the shooting. Paramedics arrived, treated Fryman, and took him to a hospital. Fryman died due to the five gunshot wounds (two to his torso and three to his back).

*The Investigation*

Police arrived and secured the crime scene. Fryman's handgun was discovered in a nearby parking lot. Police recovered five spent shell casings, which had

3

all been fired from the same gun (not Fryman's). Police noticed several surveillance cameras in the area.

A college student who witnessed the shooting from an upstairs apartment across the street contacted the police. The college student later identified Lockett from a sequential photographic line-up. Police obtained video footage from the surveillance cameras, which showed the shooting from multiple angles (without sound), as well the movements of Lockett and Fryman in the time periods before and after the shooting.

Fryman's mother T. Jackson arrived at the hospital where Fryman was pronounced dead. Jackson asked Fryman's friends to cooperate with the police. The following morning, Jackson spoke to Pedrol (Fryman's friend who was present at the shooting) in a pretext (secretly recorded) phone conversation. Jackson asked Pedrol what had happened, and they spoke for about 15 minutes.

On December 2, 2014, after learning Lockett was in Stockton, police arrested him in a vehicle. Lockett was wearing the same distinctive white sweatshirt he wore on the night of the shooting. Police recovered several electronic devices from Lockett's person and his home, including a cell phone with a Snoopy case.

On December 11, 2014, San Jose Police Detective Brian McDonald obtained a warrant to search electronic devices seized during the investigation. A forensic examiner downloaded the contents of Lockett's cell phone, which included the gun video (a 19-second video of Lockett holding the suspected murder weapon).

Lockett's phone calls were recorded while he was in jail. In one phone call, Lockett asked a woman to get a photo of "Shark" or "Sharky" wearing the same distinctive sweatshirt he had worn on the night of the shooting. In another phone call, Lockett referred to his "paperwork" (the underlying police report) and asked the woman to post the report on Instagram "so that people would know that [Pedrol] is a rat."

4

*Court Proceedings*

During a jury trial, the prosecution introduced the surveillance videos, the gun video, the two recorded jail calls, and numerous other exhibits. The prosecution also introduced the testimony of several law enforcement and forensic witnesses, as well as: the eyewitness college student, Jackson, and Wood. Although video evidence showed Wood to be standing near Fryman when the shooting occurred, Wood initially claimed he was at a nearby club when he heard the gunshots. Wood claimed the night in question was "a blur" due to his ingestion of alcohol and drugs.

At the close of the prosecution's case, Lockett moved to set aside the lying-in-wait allegation for lack of sufficient evidence. (Pen. Code, § 1118.1.)

As to the time period before the shooting, the court said "it's interesting both counsel seem to believe that [Lockett] went to an automobile . . . to pick up the gun when, in fact, he could have been armed the entire time and was just out of the camera's view, walking around or standing in a fixed location. I mean, we don't know. At least at this juncture, we don't know what he did.

"But the critical thing, it seems to the Court, is that there was this time passage when a reasonable juror could conclude that Mr. Lockett had decided, during that time frame, to kill Mr. Fryman, and that what he needed to do was essentially set him up in order to catch him unawares, and this can be done . . . , even though Mr. Fryman was aware of Mr. Lockett's presence. It doesn't necessarily have to be an ambush.

"But looking at that video, a reasonable juror could conclude that at that moment, when they were sort of squared off, just before Mr. Lockett turned around, they were facing one another. And Mr. Lockett's turning around and starting to walk away from what appears to be a confrontation could have been Mr. Lockett's attempt to sort of put Mr. Fryman at ease and then suddenly turn around and shoot him, catching him by surprise.

5

"So . . . , I think that's a reasonable inference that can be drawn from not only the video, but also from the testimony that we heard from the eyewitness as she looked out of her window on the fifth floor of her apartment building across the street from Fountain Alley.  So the motion is denied."

*The Defense*

Lockett testified on his own behalf.  As to the jail calls, Lockett said he asked a person to post "paperwork" (the underlying police report) on Instagram out of frustration, but he never sent the person the paperwork.  As far as asking a person to take a screenshot of someone wearing the same distinctive white sweatshirt he was wearing on the night of the shooting, Lockett said that he wanted to show the picture to his attorney to show that he was not lying to him.

Lockett admitted shooting Fryman.  Lockett said, "I was scared.  I seen him reach for his gun and I panicked."  Lockett said he had driven to downtown San Jose at about 9:00 p.m., to meet Marvina, Dee, and Duante.  Lockett testified he had been friends with Fryman for about two years, and that he knew Wood and Pedrol.  Lockett said he had the gun with him the entire time on his waist for protection.

Lockett testified that just prior to the shooting, he and Fryman were yelling at each other.  They were arguing about Marvina and Fryman "told me that he's tired of this back-door sh*t and lifted up his shirt."  Lockett said Fryman showed him the handgun he had in his waistband.  Lockett said Fryman threatened him with a gun a week before the shooting, and that this had occurred in front of other people.

Lockett said he was walking in a circle just prior to the shooting because he was nervous.  Lockett testified he wanted to fist fight with Fryman and told him, "Let's fight."  But according to Lockett, Fryman responded, "'No, I'm going to kill you.'"  Lockett said when his back was turned towards Fryman, he looked over his shoulder and

6

saw Fryman "reach for his gun." Lockett testified he pulled his hood over his head because he was scared.

On cross-examination, Lockett agreed he turned his back on Fryman, then spun around and shot Fryman. Lockett did not remember how many times he shot Fryman while he was on the ground, but Lockett agreed Fryman did not have a gun in his hand. Lockett agreed as he was shooting Fryman he pulled his hoodie over his head. Lockett agreed he shot Fryman intentionally, not accidentally. Lockett agreed he ran off after the shooting and did nothing to help Fryman (Lockett's cross-examination will be covered in more detail in the discussion section of this opinion).

*Judgment and Sentencing*

The jury found Lockett guilty of first degree murder. The jury also found true a lying-in-wait special circumstance allegation and a firearm allegation. Lockett admitted serving a prior prison term for a violent felony, and he admitted a strike prior.

The trial court sentenced Lockett to life without the possibility of parole. The court additionally imposed a consecutive 25 years for the firearm allegation, and three years for the prison prior.

II

DISCUSSION

Lockett argues: A) insufficient evidence of lying-in-wait; B) the trial court erred by admitting the gun video; C) his counsel was ineffective by failing to move to suppress the gun video (on the grounds that the officer's search warrant affidavit failed to establish probable cause); D) the prosecutor committed misconduct; E) cumulative prejudice; and F) the case should be remanded so the trial court can exercise its sentencing discretion as to the formerly mandatory firearm enhancement.

*A. Sufficiency of the Evidence (Lying-in-Wait)*

Lockett argues there was insufficient evidence that he "killed Fryman by lying in wait." We disagree.

In a sufficiency of the evidence review, we look at "'the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.) We presume in support of the judgment every fact that could reasonably be deduced from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053-1054.)

We may reverse for lack of substantial evidence only if "'upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331-332.) "The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.)

The three elements of lying in wait are: 1) "a physical concealment or concealment of purpose"; 2) "a substantial period of watching and waiting for an opportune time to act"; and 3) "immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage."[1] (*Stevens*, *supra*, 41 Cal.4th at pp. 201-202; *People v. Gurule* (2002) 28 Cal.4th 557, 630.)

---

[1] The three lying-in-wait elements can support a lying-in-wait special circumstance allegation as well as a lying-in-wait theory of first degree murder (distinct from premeditation and deliberation). (Pen. Code, §§ 189, subd. (a), 190.2, subd. (a)(15).) The only difference is the special circumstance "requires the specific intent to kill, whereas first degree murder by lying in wait does not." (*People v. Superior Court* (*Bradway*) (2003) 105 Cal.App.4th 297, 309-310.) Lockett does not dispute there was substantial evidence he intended to kill Fryman, so that element is not at issue.

8

A defendant can conceal his purpose, even if the victim is aware of defendant's presence. (*People v. Morales* (1989) 48 Cal.3d 527, 554-555, overruled on other grounds by *People v. Williams* (2010) 49 Cal.4th 405, 409.) The California Supreme Court has "never placed a fixed time limit" on the required "substantial" period of watching and waiting. (*People v. Moon* (2005) 37 Cal.4th 1, 23.) "Indeed, the opposite is true, for we have previously explained that '[t]he precise period of time is . . . not critical.'" (*Ibid.*) "Even accepting defendant's testimony that he waited only a few scant minutes before killing [the murder victim], a few minutes can suffice." (*Ibid.*) The purpose of the "'substantial' period" requirement "'is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse.'" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1073.) The third element of a surprise attack "'immediately thereafter'" the period of watching and waiting, ensures that the murder was committed "by means of lying in wait" rather than "'*while*' lying in wait." (*People v. Michaels* (2002) 28 Cal.4th 486, 516-517.)

It has often been said a picture is worth a thousand words. If that statement is true, then a video recording (or eight video recordings) is certainly worth exponentially more than a thousand words. The point is, in this case we have reviewed the videos shown to the jury during the trial, and they are not at all helpful to advancing Lockett's substantial evidence argument on appeal.

During the verbal argument, there was a period when Lockett was walking in a circle with his back towards Fryman. Although this period of watching and waiting was brief, based on his subsequent actions, a reasonable jury could deduce Lockett was furtively moving in order to *conceal his purpose*: to shoot and kill Fryman. Further, a reasonable jury could also deduce Lockett was using this brief period of watching and waiting *for an opportunity to act*. And then Lockett—suddenly—spun around and shot Fryman with a concealed firearm. Again, a jury could reasonably deduce Lockett *conducted a surprise attack from a position of advantage*: the fatal shooting.

9

In short, primarily based on the video evidence, but also based on the other physical and testimonial evidence (including the eyewitness testimony and Lockett's concessions during cross-examination), we find substantial evidence in the record to support the jury's true finding of the lying-in-wait special circumstance allegation.

Lockett argues: "The whole sequence took less than a minute." Therefore, he argues he "did not watch and wait for a substantial period of time." We disagree.

"The lying in wait does not need to continue for any particular period of time, but its duration must be substantial and must show a state of mind equivalent to deliberation or premeditation." (CALCRIM No. 728; *People v. Poindexter* (2006) 144 Cal.App.4th 572, 582-585 (*Poindexter*).) In *Poindexter*, "defendant and the victim were engaged in a verbal altercation on a public street, with several other individuals in the vicinity. Defendant told the victim something to the effect of 'I'll show you what I mean,' and 'stay here if you want to live.' Defendant then walked to a nearby garbage can, retrieved a shotgun, and returned to the victim within a minute. He carried the shotgun in plain view, pointed down. He said something to the victim, who replied, 'It's not that serious.' Defendant then quickly shot the victim three times with the shotgun." (*Id*. at pp. 585-586, fn. omitted.) The Court of Appeal found that though the time period was less than a minute, "there was sufficient evidence in the present case that defendant had the state of mind of premeditation or deliberation, and the evidence thus sufficed to demonstrate the requisite period of watching and waiting." (*Id*. at pp. 584-585.)

Here, just as in *Poindexter*, the time Lockett spent watching and waiting was arguably less than a minute. However, just as in *Poindexter*, we hold that the jurors could have reasonably concluded this time was "substantial" enough to "show a state of mind equivalent to premeditation and deliberation." (See CALCRIM No. 728; see also CALCRIM No. 521 ["The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and

10

premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time"].)

Lockett also argues he "did not launch a surprise attack from a position of advantage, as that concept is defined by case law." We disagree.

For the purposes of lying in wait, it is not required that the defendant be literally concealed from the victim's view before launching the surprise attack. (*Stevens*, *supra*, 41 Cal.4th at pp. 203-204.) In *Stevens*, defendant pulled alongside a vehicle on an interstate freeway. (*Id*. at pp. 187-188.) "Defendant motioned as though trying to get Stokes's [the driver's] attention, and smiled at him." (*Ibid*.) When Stokes slowed down and lowered his passenger window, defendant shot at him and missed. (*Ibid*.) Stokes then saw defendant pull up to a second vehicle, and similarly gained "'the attention of the other driver' [August] because both sets of brake lights came on." (*Id*. at p. 188.) Defendant then shot at August two times and killed him. (*Id*. at pp. 187-188.) The jury found defendant guilty of several charges, including the murder of August, and found true a lying-in-wait special circumstance allegation. (*Id*. at p. 187.) In this death penalty appeal, defendant argued there was insufficient evidence to sustain the lying-in-wait special circumstance. The California Supreme Court disagreed. (*Id*. at p. 201.)

"The facts here are more than sufficient to establish that after the assault on Stokes, defendant turned his attention to a new target. He selected August, the driver of the only other nearby car on the road ahead of him, as his next victim. He approached and concealed his deadly purpose by pulling up alongside of August and induced him to slow down. August did so, just as Stokes had. This process may not have taken an extended period, because defendant did not have to wait long until his next target became available. But there is no indication of rash impulse. To the contrary, it was reasonable for the jury to conclude that defendant acted to implement his plan of *luring a victim of opportunity into a vulnerable position by creating or exploiting a false sense of security*. The jury could also reasonably conclude that August was taken by surprise. He did not

11

flee, but slowed down and drove side-by-side with defendant, just as Stokes had done. Once the intended victim slowed down, the time to act became opportune. Defendant stopped watching and started shooting. Such behavior is completely consistent with, and provides substantial evidence for, the watching and waiting element of the lying-in-wait special circumstance." (*Stevens*, *supra*, at p. 203, italics added.)

Here, the jury could have reasonably concluded Lockett was not acting out "of rash impulse" and, just as in *Stevens*, Lockett lured Fryman "into a vulnerable position by creating or exploiting a false sense of security." (*Stevens*, *supra*, 41 Cal.4th at p. 203.) As noted by the trial court, "looking at that video, a reasonable juror could conclude that at that moment, when [Lockett and Fryman] were sort of squared off, just before Mr. Lockett turned around, they were facing one another. And Mr. Lockett's turning around and starting to walk away from what appears to be a confrontation could have been Mr. Lockett's attempt to sort of put [Fryman] at ease and then suddenly turn around and shoot him, catching him by surprise."

Lockett argues *People v. Flinner* (2020) 10 Cal.5th 686 (*Flinner*), and *People v. Nelson* (2016) 1 Cal.5th 513 (*Nelson*), compel a different result. We disagree.

In *Flinner*, defendant told his fiancée T. Keck to go to a gas station to pick up H. Ontiveros. (*Flinner*, *supra*, 10 Cal.5th at p. 699.) Keck picked up Ontiveros and took him to a nearby cul-de-sac, where Ontiveros's car was parked. While Keck was propping open the hood of her car, Ontiveros "approached her from behind and shot her in the back of the head, killing her." (*Ibid*.) The Supreme Court found sufficient evidence to support a lying-in-wait special circumstance: "a jury could reasonably conclude that Ontiveros """"watch[ed] and wait[ed] for an opportune time to act""""" on the drive from the gas station to the cul-de-sac, while Keck parked and got out of the car, and while she proceeded to open the hood of the car, before launching """"a surprise attack""""" on Keck from an advantageous position: from behind her as she was otherwise preoccupied with opening the hood." (*Id*. at p. 751.)

12

In *Nelson*, defendant rode to a store parking lot on his bicycle armed with a loaded gun. (*Nelson*, *supra*, 1 Cal.5th at p. 522.) Two of his former coworkers were in the front seat of a parked car. Defendant "Nelson parked his bicycle, approached the car on foot from behind and fired several shots into the car through an open rear window, then started to walk away before returning and firing again into the car." (*Ibid*.) The Supreme Court found insufficient evidence of lying in wait: "There is no evidence . . . that Nelson arrived before the victims or waited in ambush for their arrival. In the absence of such evidence, there is no factual basis for an inference that before approaching the victims, he had concealed his bicycle and waited for a time when they would be vulnerable to surprise attack." (*Id*. at p. 551.)

We recognize, of course, that we are bound by the opinions of the California Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) However, we do not interpret the holdings, or the ratio decidendi of *Flinner* or *Nelson* to be limited to their particular facts. "The fundamental rule for determining the precedential force and applicability of a case is to ascertain its true holding or ratio decidendi. The rule has been summarized as follows: 'The *ratio decidendi* is the principle or rule which constitutes the ground of the decision, and it is this principle or rule which has the effect of a precedent.'" (*Santa Monica Hospital Medical Center v. Superior Court* (1988) 203 Cal.App.3d 1026, 1033.)

The facts in *Flinner* and *Nelson* (or a multitude of other cases), may be either distinguishable or similar to the facts in the instant case in some respects. But the Supreme Court has not altered the fundamental elements of a lying-in-wait special circumstance murder allegation as we have discussed. In sum, we agree with the cogent analysis of the trial court and find substantial evidence—*in this appellate record*—to support each element of the lying-in-wait special circumstance allegation.

*B. The Trial Court's Admission of the Gun Video*

Lockett argues the trial court erred "by allowing the jury to view an irrelevant and highly prejudicial video of Lockett waving a gun around." (Capitalization & boldfacing omitted.) We disagree. In any event, even if we were to find error, we would not find the error to be prejudicial under any standard.

In this part of the discussion, we will: 1) review general principles of law regarding the admissibility of evidence; 2) consider the relevant proceedings concerning the admission of the gun video; and 3) analyze the law as applied to the facts.

*1. General Principles of Law*

A court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1095.) "Specifically, we will not disturb a trial court's admissibility ruling '"except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."'" (*People v. Morales* (2020) 10 Cal.5th 76, 97.)

A criminal judgment cannot be reversed on appeal based on the erroneous admission of evidence unless: 1) the defendant objected to the evidence on a specific ground; and 2) the reviewing court finds the "evidence should have been excluded on the ground stated." (Evid. Code, § 353, subds. (a) & (b).)[2] Further, a defendant must establish that the error "complained of resulted in a miscarriage of justice." (§ 353, subd. (b); see *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [defendant must show a reasonable probability of more favorable outcome in the absence of the error].)

Generally, "all relevant evidence is admissible." (§ 351.) "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness . . . ,

---

[2] Further undesignated statutory references are to the Evidence Code.

14

having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.)

Once the relevance of evidence is established, a court may then further weigh the quality and the strength of the evidence (its probative value) against the probability that the evidence will "necessitate undue consumption of time or . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) "The weighing process under section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.)

One of the purposes of section 352 is to exclude otherwise relevant evidence that "'uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues.'" (*People v. Robinson* (2005) 37 Cal.4th 592, 632.) However, evidence is not unduly prejudicial merely because the evidence is harmful to a party's interests. (*People v. Megown* (2018) 28 Cal.App.5th 157, 164.) Indeed, if the evidence is being proffered by the prosecution it is likely to be harmful to the defendant's interests (because such evidence is ordinarily probative of the defendant's guilt). Proffered prosecution evidence only creates "undue prejudice" under the Evidence Code if it tends to evoke an emotional bias by the jurors against the defendant, *and* the evidence has little probative value. (*Ibid*.)

### 2. Relevant Proceedings

Prior to trial, the prosecution sought to admit a 19-second video recovered from Lockett's cell phone. The gun video showed Lockett in a car waving a gun and moving rhythmically, while rap music was playing in the background. The prosecution intended to introduce the testimony of a firearms expert who would testify the gun looks like the same type of Glock handgun that fired the shots that killed Fryman. Lockett objected on relevancy grounds, and also that the video was more prejudicial than

15

probative. (§ 352.) The trial court tentatively ruled the video would be admitted but left open the question of whether the rap music playing in the background should be excluded from the video.

Following jury selection, Lockett's counsel argued: "I'm concerned that . . . when you combine a rap song with guns, to be honest with you, an African-American male in the car, we're going to have jurors who use those factors in inappropriate ways, or we could." The court stated "for three and a half days, we heard our jurors talk about their concerns. And we talked about race. And we talked about firearms and their feelings about firearms even being involved in the case. And we spent a lot of -- we spent a lot of time on that. And so the Court's thought about the evidence now is informed by three and a half days of jury selection, and it seems to the Court that we have to be very careful about the evidence creating an appearance, an environment which could be broadly characterized as 'the thug life.'"

After hearing further argument from the prosecution, the court ruled: "This is the Court's fear: young, African-American male in a video holding what appears to be a Glock semiautomatic or some similar firearm, and rap music being played in the background. Maybe it says more about the Court than the reality of the situation, but that's my fear that what will be created is this stereotypical notion of 'the thug life.' So I'm going to order that the video be stripped of the audio."

During the prosecution's case-in-chief, Lockett renewed his objections to the playing of the gun video. The court ultimately admitted the gun video and two video screenshots.[3] The court explained its analysis concerning its evidentiary ruling as follows:

_____

[3] One of the screenshots was from another nearly identical video from Lockett's cell phone, which was not admitted into evidence.

16

"While it's true that it may be clear that Mr. Lockett fired the shots, none of us can predict the future with respect to if Mr. Lockett is going to take the witness stand and what he's going to say.

"But more importantly, as far as the Court is concerned, when I talk about identity, the Court is not talking about just Mr. Lockett, but rather the connection, the nexus between Mr. Lockett and the cartridges and presumably the gun that was used to fire those cartridges. That gun was never recovered. The gun that was found presumably was on Mr. Fryman, and we've already had testimony that . . . the spent shell casings, did not match up to the gun that was found underneath the automobile. [The expert] fired bullets into a tank full of water and found that there was not a match.

"So these photos, then, I think, are relevant to establish the nexus between Mr. Lockett and what could be the firearm that was used to kill Mr. Fryman.

"And so when weighing the probative value against the prejudicial effect . . . I mean, if . . . this evidence [were to] be allowed in a petty theft case, that would be one thing, but this is a murder case, and so where the jurors have actually seen the moment where Mr. Fryman was shot. So I disagree, [defense counsel], with your analysis with respect to the prejudicial effect outweighing the probative value. I think it tips in the other direction. It's not going to take a lot of time once we get the jury back, and I don't think it's going to confuse the jurors."

After the court's ruling, a firearms expert testified while the gun video was played for the jury. The expert opined the gun in the video appeared to be a Glock 23 pistol, based on various observed design features and other indicia. Other testimony further established a spent projectile recovered from Fryman's body, and the spent shell casings recovered from the crime scene, were consistent with a Glock 23 or a similar firearm.

After the video played, defense counsel told the court he heard "two or three audible sighs coming from the jury box," although counsel said it did not rise to the

17

level of juror misconduct. The prosecutor confirmed she also heard "audible sighs but that has been true throughout the trial." The court declined to interview the jurors because "asking them about their thoughts with respect to that piece of evidence puts us in danger of intervening into the jury deliberation process."

During Lockett's direct testimony, he admitted creating the gun video. However, Lockett denied the gun in the video was the same one he used to shoot Fryman. Lockett said he gave the Glock 23 handgun he used to shoot Fryman to a friend because "it reminded me of what happened."

The trial court admonished the jurors:

"During a trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other. [¶] The video of Mr. Lockett holding a gun was admitted solely as circumstantial evidence that he may have possessed a Glock gun when he shot Mr. Fryman."

### 3. Application and Analysis

During the pretrial hearing, during jury selection, and during the trial, the court repeatedly considered the relevancy of the gun video. The court also weighed the probative value of the gun video against its prejudicial effect, as well as considering other factors such as consumption of time. (See § 352.) The court took actions to limit the potential prejudicial impact of the gun video by ordering the prosecution to eliminate the background rap music, and by giving the appropriate limiting instruction to the jury. We cannot say the court's discretionary evidentiary ruling was arbitrary or capricious; rather, the court appears to have thoughtfully weighed its decision according to the facts and the law. Thus, we find no abuse of the court's discretion.

Lockett argues the gun video was "irrelevant because it had already been well established that Lockett was the person who shot Fryman." We disagree.

18

"'Relevant evidence' means evidence . . . having *any tendency in reason* to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210, italics added.) When evidence "is *merely* cumulative of other evidence" then its probative value "is diminished." (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 244, italics added.) However, "so long as facts testified to by a party *are not conclusively* established or admitted, they are open to further proof." (*Evans v. Industrial Acc. Com.* (1945) 71 Cal.App.2d 244, 248-249, italics added.)

Here, the evidence showed Fryman was likely killed with a Glock 23 handgun, and the video tended to prove Lockett possessed a Glock 23 handgun. The evidence was relevant because it had some "tendency in reason to prove" Lockett was the person who killed Fryman. (See § 210.) At the point when the gun video was introduced at trial, it had arguably already been well established that Lockett was, in fact, the person who killed Fryman. But that fact does not alter the *relevancy* of the evidence. (See § 210.) It is also true the video was arguably cumulative of other evidence introduced by the prosecution; therefore, the court may have chosen to exclude the evidence despite its relevance. But the court determined the gun video was not unduly prejudicial, nor was the probative value of the evidence outweighed by the consumption of time. (See § 352.)

When reviewing a trial court's rulings, we must always be mindful of the standard of review, which in this case is for an abuse of discretion. It is plainly not the role of an appellate court to second guess the discretionary rulings of a trial court. Again, there is no indication that the trial court in this case reached its decision in an arbitrary or capricious manner. Therefore, we must affirm its decision.

Lockett argues the gun video "made him look like a thug and powerfully undermined his claim of self-defense." We disagree.

Even if we were to find the court erred by admitting the video under section 352, we would not find the error to be prejudicial under any standard. (See *Watson*, *supra*, 46 Cal.2d at p. 836 [defendant must show a reasonable probability the outcome of

19

the proceeding would have been different in the absence of the error]; see also *Chapman v. California* (1967) 386 U.S. 18, 23-24 (*Chapman*) [prosecution must show the error was harmless beyond a reasonable doubt].)

The gun video was only 19 seconds long, and it merely showed Lockett holding a handgun while moving rhythmically. The videos of Lockett actually shooting Fryman were unquestionably far more likely to have "made him look like a thug and powerfully undermined his claim of self-defense."

Further, the surveillance videos as well as the other testimonial and physical evidence supported a finding of murder by means of lying in wait, which presumably was a wholesale rejection of Lockett's claim of self-defense. (See *People v. Battle* (2011) 198 Cal.App.4th 50, 75 ["if the jury found murder by lying in wait, provocation was irrelevant"]; *People v. Cruz* (2008) 44 Cal.4th 636, 665 ["special circumstance findings [negated] any possibility that defendant was prejudiced from the failure to instruct on provocation/heat of passion or unreasonable self-defense theories"].)

Lockett's actions immediately after the shooting also belied his claim of self-defense. Lockett shot Fryman four times as he lay on the ground, despite his admission Fryman did not have a gun in his hand. Other evidence showed Lockett's conscious of guilt: he covered his face and ran away; he asked a person to put the underlying police report on social media in order to expose his friend Pedrol as a "rat" for speaking to Fryman's mother about the shooting; and he tried to obtain a photo of a friend wearing the same white sweatshirt he had worn the night of the shooting.

In sum, we find the trial court did not abuse its discretion by admitting the gun video. And in the alternative, even if we were to find evidentiary error, we would not find the error to be prejudicial under any standard.

20

*C. Ineffective Assistance*

A criminal defendant has a right to effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 685-686 (*Strickland*).) To establish a violation of this right, a defendant must show: 1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and 2) this resulted in prejudice to the defendant. (*Id.* at pp. 687-688, 691-692.)

Under *Strickland*, a reviewing "court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . , that course should be followed." (*Strickland*, *supra*, 466 U.S. at p. 697.) Under the second prong, "the test for 'prejudice' is not solely one of outcome determination. Instead, the pertinent inquiry is 'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.'" (*In re Avena* (1996) 12 Cal.4th 694, 721-722.)

Here, Lockett's counsel moved to suppress the gun video on several grounds. Nonetheless, Lockett argues ineffective assistance of counsel (IAC) because counsel failed to argue "the search warrant application lacked probable cause to believe that incriminating evidence would be found on the phone."

As recommended by the Supreme Court, we can dispose of Lockett's IAC claim based on a lack of sufficient prejudice. (See *Strickland*, *supra*, 466 U.S. at p. 670.) That is, if we presume counsel was ineffective because he failed to move to suppress the gun video on the grounds that the search warrant affidavit failed to establish probable cause—and we further presume the gun video would have then been suppressed—it does not matter because we have already concluded the admission of the gun video was not arguably prejudicial. (See discussion regarding prejudice, *infra*.) Consequently, the resulting admission of the gun video (due to counsel's presumed deficient performance)

21

could not have logically rendered "the trial unreliable or the proceeding fundamentally unfair.'" (See *In re Avena*, *supra*, 12 Cal.4th at p. 721.)

Thus, Lockett's IAC claim is meritless because he has failed to show prejudice under the second prong of the *Strickland* test.

## D. Prosecutorial Misconduct

We evaluate claims of prosecutorial misconduct under well-established standards. "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

Further, "'when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" (*People v. Ochoa* (1998) 19 Cal.4th 353, 427; *People v. Booker* (2011) 51 Cal.4th 141, 186 [prosecutorial misconduct does not cause prejudice under any standard of review where evidence of guilt was overwhelming].)

"'A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state.'" (*People v. Hill* (1998) 17 Cal.4th 800, 819-820.) However, "'the term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667.)

"It is misconduct for a prosecutor to violate a court ruling by eliciting or attempting to elicit inadmissible evidence in violation of a court order. [Citation.] It is also misconduct for a prosecutor to make remarks in opening statements or closing arguments that refer to evidence determined to be inadmissible in a previous ruling of the trial court. Because we consider the effect of the prosecutor's action on the defendant, a determination of bad faith or wrongful intent by the prosecutor is not required for a finding of prosecutorial misconduct." (*People v. Crew* (2003) 31 Cal.4th 822, 839.)

Generally, in order to raise an alleged error on appeal, the issue must have first been raised in the trial court. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 & fn. 2.) Specifically, a defendant forfeits a prosecutorial misconduct claim on appeal unless the defendant objected to the alleged misconduct when it occurred, and further asked the court to admonish the jury. (See *People v. Ervine* (2009) 47 Cal.4th 745, 806.)

Lockett argues the prosecutor committed misconduct on three grounds: 1) by asking Lockett about prostitution and pimping during cross-examination; 2) by appealing to the jury's sympathy during closing argument; and 3) by pointing out Fryman failed to call any witnesses to support his claim of self-defense. We agree with Lockett on the first two grounds; however, we do not find these errors to be prejudicial (separately or in the aggregate).

*1. The prosecutor committed misconduct by repeatedly asking Lockett about prostitution and pimping in violation of the court's ruling.*

Except as otherwise provided, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (§ 1101, subd. (a).)

A prosecutor "may not interrogate witnesses solely 'for the purpose of getting before the jury the facts inferred therein, together with the insinuations and

23

suggestions they inevitably contained, rather than for the answers which might be given.'" (*People v. Wagner* (1975) 13 Cal.3d 612, 619-620, superseded on other grounds as stated in *People v. Dalton* (2019) 7 Cal.5th 166, 213.) A prosecutor also "may not, under the guise of cross-examination, get before the jury what is tantamount to devastating direct testimony." (*People v. Shipe* (1975) 49 Cal.App.3d 343, 349.)

"'It is improper for a prosecutor to ask questions of a witness that suggest facts harmful to a defendant, absent a good faith belief that such facts exist.'" (*People v. Bolden* (2002) 29 Cal.4th 515, 562.) A good faith belief does not simply mean that the prosecutor believes the suggested facts in his or her questions are true, but that the prosecutor could, in fact, prove the facts if they are denied by the witness. (*People v. Blackington* (1985) 167 Cal.App.3d 1216, 1221 ["'It was improper to ask questions which clearly suggested the existence of facts which would have been harmful to defendant, in the absence of a good faith belief by the prosecutor that the questions would be answered in the affirmative, or with a belief on his part that the facts could be proved, and a purpose to prove them, if their existence should be denied'"].)

During motions in limine, the prosecution sought to impeach Lockett with his prior convictions and other evidence showing his criminal conduct, should he choose to testify. The prosecutor proffered, "I could put up the prostitution ads that were on his phone, or the text message of him trying to entice a woman to work for him. Or I could simply present evidence, his own text messages where he says, 'I'm a pimp,' where those are the words that he's using."

After hearing further argument, the court denied the prosecutor's motion: "It's going to be, essentially, too damning. That you're going to be able to paint a picture that Mr. Lockett is this evil person, engaged in human trafficking, selling drugs, committing crimes of violence. And it may all be true. It may all be true. But what the Court has to consider is then, what is the defendant being tried for?" The court continued: "So . . . what I will allow is the possession of a firearm by a felon. You can

24

show that with the picture.  It doesn't look like it's going to take all that much time.  It . . . seems to the Court, consistent with the charge in this particular case.  And it doesn't broaden the horizon with-respect to the activity that Mr. Lockett may or may not be involved in.  [¶]  So I'll allow that. The others -- we won't."

During direct examination, Lockett testified he and Fryman were arguing over a woman named Marvina.  Without revisiting the trial court's pretrial ruling, on cross-examination, the prosecutor asked Lockett:

"Q.  What's Marvina's last name?

"A.  I don't know.

"Q.  Is Marvina Jones --

"A.  I don't know.

"Q.  Is Marvina Jones a prostitute?

"A.  Marvina's not a prostitute.

"Q.  How do you know that?

"A.  Because when she messed with me, I never -- if she is, ma'am, I'm not sure, but when she messed with me, it was never no prostitute, none of that.  I never knew nothing about none of that. Never seen that or nothing.

"Q.  We're you arguing with Tyrone Fryman over a prostitute?

"A.  No."


The prosecutor later asked Lockett:

"Q.  Is [Fountain Alley] an area where a lot of prostitutes hang out?

" A.  I don't know.

"Q.  You don't know?"


The court sustained an objection that the question had been asked and answered.  The prosecutor continued:

25

"Q. You ever seen any prostitutes hanging out in Fountain Alley?

"A. I've seen some down there walk by. [¶] . . . [¶]

"Q. So when I asked you a moment ago, is this an area where prostitutes hang out and you said you didn't know, would you like to change that answer now and say yes, you've seen a few prostitutes hanging out there?"

The court sustained an argumentative objection. The prosecutor later continued:

"Q. Was Marvina prostituting herself in Fountain Alley?

"A. No.

"Q. Did this cause some tension between you and Tyrone?

"A. Marvina did, but not the prostitutes, if that's what you're talking about.

"Q. Did you ever know Tyrone to pimp out women?

"A. No."

Later on, the prosecutor asked:

"Q. And when he pulled that gun on you, did he say anything about Marvina?

"A. No.

"Q. Did he say anything about you trying to steal one of his prostitutes?"

The court sustained an objection that the question assumed facts not in evidence. The prosecutor asked:

"Q. Did you know any of Tyrone's other girlfriends?

"A. Yes.

"Q. Were you back-dooring any of Tyrone's other girlfriends?

26

"A. No, but I mean back-door can be, like, you take a pair of my pants, or just, like, doing something without his knowledge.

"Q. Or if you take another pimp's prostitute, could that be back-dooring?"

The court sustained a speculation objection and excused the jury.[4] The prosecutor explained that in the pretext call with Jackson, Pedrol said "the defendant and the victim were fighting over a prostitute." The prosecution further stated based on the recorded jail calls, and the information from Lockett's cell phone, there were multiple indications he was a pimp. Based on Lockett's direct testimony, the prosecutor said she had checked a criminal database and there was a person by the unusual name of "Marvina" in the database indicating she was "an underaged girl that was being pimped out by a group called Money Gang." The prosecutor said, "I think there is ample evidence for me to explore an alternative to Defense's theory that this was just a fight over a romantic relationship, and to show that there was actually some financial motivation to the defendant killing the victim."

The court said: "You can ask questions when you have a good faith basis for asking the question. A name in a database, I don't think, rises to that standard." The court further said "your good faith basis relies on a statement made by . . . Pedrol, who we know is not going to testify, and we've told the jury that he's not going to testify; so he's not available. He's not available to impeach Mr. Lockett's testimony. [¶] And so under those circumstances, [prosecutor], I'm not going to allow you to continue to go down this avenue of prostitution and Mr. Lockett's possible involvement, Mr. Fryman's possible involvement . . . [and] the individual . . . identified as Marvina."

---

[4] Lockett's counsel never objected on the grounds of prosecutorial misconduct and counsel never asked the court to admonish the jury, so this ground is forfeited for purposes of appeal. Nevertheless, we shall address it on its merits. (See *People v. Vega* (2015) 236 Cal.App.4th 484, 495 [an appellate court may address a forfeited issue to forestall a related claim of ineffective assistance of counsel].)

After hearing further argument, and hearing recorded jail conversations, the court said: "All right. Thank you. Court's made its ruling. Neither one of these conversations is coming in. And [prosecutor], this Court is asking you, accordingly, quite frankly, to move off this pimping and prostituting subject and explore other issues with Mr. Lockett. All right. Let's call the jurors back."

During closing argument, the prosecutor questioned Fryman's credibility, arguing: "You don't turn your back on a person during an argument if they're brandishing a gun." The prosecutor further argued: "And then the statement to the question, 'Is Marvina a prostitute?' 'Not that I'm aware of' is a really odd answer to that question. So as jurors, you are left to ask, who do you believe? What should you believe when you look at this evidence?"

The trial court gave the jurors pattern instructions regarding "evidence," and what information they were allowed to consider in reaching their verdict:

"You must decide what the facts are. It is up to all of you, and you alone to decide what happened, based only on the evidence that has been presented to you in this trial." (CALCRIM No. 200.)

"'Evidence' is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence. [¶] Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. Their questions are not evidence. Only the witnesses' answers are evidence. The attorneys' questions are significant only if they helped you to understand the witnesses' answers. Do not assume that something is true just because one of the attorneys asked a question that suggested it was true." (CALCRIM No. 222.)

In this case, the prosecutor repeatedly asked Lockett questions during cross-examination about prostitution, despite the court's pretrial ruling that forbade such questions. These questions tended to suggest Lockett was a person of bad character,

28

which was in violation of the Evidence Code. (See § 1101, subd. (a).) In short, the questions regarding prostitution during the cross-examination of Lockett constituted prosecutorial misconduct. The final comment about prostitution in the closing argument further compounded the error.

The prosecutor's explanation that there was a "good faith" basis for the questions was mistaken under the appropriate legal definition of "good faith." That is, the prosecutor did not establish there was admissible evidence to prove Lockett and Fryman were involved in prostitution or that they were having a financial dispute regarding a prostitute named Marvina. (See *People v. Bolden*, *supra*, 29 Cal.4th at p. 562 ["'It is improper for a prosecutor to ask questions of a witness that suggest facts harmful to a defendant, absent a good faith belief that such facts exist'"]; *People v. Blackington*, *supra*, 167 Cal.App.3d at p. 1221 [good faith belief does not simply mean that the prosecutor believes the suggested facts in his or her questions are true, but that the prosecutor could, in fact, prove the facts if they are denied by the witness].)

We now turn to the question of whether Lockett was prejudiced by the prosecutor's misconduct. (See *People v. Arias* (1996) 13 Cal.4th 92, 161 [when an appellate court finds that prosecutorial misconduct occurred, reversal is not required unless the defendant can show he suffered prejudice].)

The prejudicial effect of prosecutorial misconduct is evaluated under *Chapman*, to the extent federal constitutional rights are implicated; the prejudicial effect is evaluated under *Watson* if only state law issues were involved. (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 514-515.) Federal constitutional rights are implicated if the prosecutor's conduct renders the trial so fundamentally unfair that due process is violated. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214-1215.) State rights are implicated if the prosecutor uses "'"'"deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"'"'" (*Ibid.*) "One such means is 'eliciting or

29

attempting to elicit inadmissible evidence' in defiance of a court order." (*People v. Wallace* (2008) 44 Cal.4th 1032, 1070-1071.)

Here, we find that even though prosecutor's questioning about the topic of prostitution constituted misconduct because the prosecutor was attempting to elicit evidence in defiance of the court's order, the prosecutor's misconduct did not render the trial so fundamentally unfair that it triggered the *Chapman* standard. Nor do we find it is reasonably probable that a more favorable result to Lockett would have been reached absent the prosecutor's misconduct under *Watson*.

Given the overwhelming evidence of Lockett's guilt, the surveillance videos and other evidence that belied Lockett's claim of self-defense, and the instructions that the jurors were not to treat the prosecutor's questions or arguments as evidence, we find this ground of prosecutorial misconduct did not result in prejudice.

*2. The prosecutor committed misconduct by appealing to the jurors' sympathy for Fryman and his family during closing argument.*

It is well settled that "an appeal for sympathy for the victim is out of place during an objective determination of guilt." (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1057, reversed on another ground in *Stansbury v. California* (1994) 511 U.S. 318.) "'It is, of course, improper to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response."'" (*People v. Redd* (2010) 48 Cal.4th 691, 742-743.)

During closing argument, after showing the jury Fryman's autopsy photos, the prosecutor said: "But one thing I'm going to ask you to do is not just remember Tyrone Fryman as a person in the morgue on an autopsy table. I'm going to ask you to remember that he was a real person, that he was only 24 years old when he died. You can't get a lot of living up to age 24. He had a family – " Lockett's counsel objected; the

30

court overruled the objection. The prosecutor continued: "-- that cared about him. He had a mother who misses him, so much so --"

Lockett's counsel objected again: "I would object, your honor. May we approach?" The court replied: "No. I'm going to sustain it. I didn't mind the first question -- or the first statements were fine. I think now we ought to move on, [prosecutor]." The prosecutor continued: "So much so that she cooperated with the police, she just wanted justice in this case. As soon as she knew who it was who shot her son, she was with the police the same day he died, trying to give them as much information as possible so that she could get justice for Tyrone."

After the prosecutor continued closing argument until a break, there was a discussion outside of the jury's presence. Lockett's counsel argued: "I did not want to make a speaking objection or further interrupt Counsel's argument, but I objected at a point where she was talking about Mr. Fryman, about his youth, about how you can't get a lot of living into that small number of years, talking about, then, his mother. She ended that part about the mother cooperating with law enforcement to get justice for Mr. Fryman. I think all of those comments were improper appeals to the jury. They were appeals for sympathy, and I think they were improper, and that was the reason for my objection. And I would request that the Court instruct the jury again that they're not to take sympathy into consideration."

After hearing further argument from the parties, the trial court read the following admonition to the jury: "This morning, near the end of the morning's session, there were a couple of objections to the prosecutor's argument. The Court overruled the first objection, and then with respect to the second objection, I asked [the prosecutor] to move on, which was tantamount to sustaining the objection. [¶] I want to just -- the second objection. I want to just read a portion of the first instruction that I read to you this morning in the third paragraph, it is noted, 'Do not let bias, sympathy, prejudice, or public opinion influence your decision. Bias includes, but is not limited to, bias for or

31

against the witnesses, attorneys, defendants, or alleged victims based on disability, gender, nationality, national origin, race, ethnicity, religion, gender identity, sexual orientation, age, or socioeconomic status.' Thank you." The prosecutor then continued with her closing argument.

The prosecutor's statement that Fryman's mother cooperated with the police immediately upon her son's death was a fair comment on the evidence. The argument tended to bolster Jackson's credibility. However, the prosecutor's argument that Fryman could not "get a lot of living" at the age of 24, and that his mother "cared" about him and "misses" him were plainly appeals to the jurors' sense of sympathy.

However, we do not find that those two very brief appeals to the jurors' sympathies constituted prejudice under either the federal or state standards. Further, the court immediately gave the jury an admonition, which we presume the jury listened to and followed. (See *People v. Dickey* (2005) 35 Cal.4th 884, 914 ["We presume the jury heeded the admonition and that any error was cured"].)


*3. The prosecutor did not commit misconduct during closing argument by pointing out the absence of logical witness to support Lockett's claim of self-defense.*

Under the Fifth Amendment to the United States Constitution: "No person shall be . . . compelled in any criminal case to be a witness against himself." And as a corollary to that rule, the United States Supreme Court has held that it is reversible error for a prosecutor to comment on a criminal defendant's failure to testify at trial. (*Griffin v. California* (1965) 380 U.S. 609, 612-613.) Further, it is prosecutorial misconduct for a prosecutor to make an argument that "could reasonably be interpreted as suggesting to the jury she did not have the burden of proving every element of the crimes charged beyond a reasonable doubt." (*People v. Hill* (1998) 17 Cal.4th 800, 831-832.)

However, a prosecutor does not commit misconduct by highlighting a defendant's failure to call logical witnesses: "It is now well established that although

32

*Griffin* prohibits reference to a defendant's failure to take the stand in his own defense, that rule 'does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses.'" (*People v. Vargas* (1973) 9 Cal.3d 470, 475-476.)

Prior to closing arguments, the court instructed the jury: "If you find that Tyrone Fryman threatened or harmed the defendant in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable."

Lockett's counsel argued during closing argument: "So take this reasonable person, put them at the mouth of Fountain Alley, about 11:30, close to midnight, the night before Halloween, in an argument with Tyrone Fryman. Mr. Fryman threatens to kill him, lifts up his shirt to reveal that gun in his waistband. Consider that the reasonable person knows that he had been threatened by Mr. Fryman about a week before when Mr. Fryman pulled a gun on him then."

During rebuttal closing argument, the prosecutor argued: "Well, according to the defendant, when Tyrone Fryman pulled a gun on him a week ago, there [was] a group of people watching. You didn't hear from any of those people. They didn't call anyone as a witness to support the defendant's story. This is solely his word. [¶] In that self-defense instruction, you can consider the fact that Tyrone Fryman pulled a gun on the defendant to [*sic*] his state of mind, but you have to first accept that statement, if you believe it in the first place. The Defense could have proven that up through other witnesses, or at least shown us something to support that contention, aside from the defendant's statement. Personal – "

Defense counsel objected on the ground that the argument: "Shifts the burden." The court overruled the objection: "Prosecution can argue state of evidence."

The prosecutor then continued: "As jurors, you can consider the Defense's failure to call logical witnesses. Now, if the defendant claims that Tyrone Fryman pulled a gun on him one week earlier and there were witnesses to this event, the fact that he

33

didn't bring anyone to court to support that statement is something that you may consider that maybe he's not telling the truth, maybe it didn't happen. Would it stand to reason that it didn't happen, [because] the defendant's hanging out with [Fryman] a week later? You can consider failure to call logical witnesses."

The court instructed the jury: "Neither side is required to call all witnesses who may have information about the case or to produce all physical evidence that might be relevant." (CALCRIM No. 300.)

Here, during his testimony, Lockett testified Fryman threatened to kill him a week prior to the shooting. Lockett specifically testified this threat occurred in front of other people. Therefore, it was permissible for the prosecutor to argue Lockett's testimony was likely a fabrication because Lockett failed to call any witnesses that may have witnessed the claimed threat and/or corroborated Lockett's account. In short, the prosecutor's argument in this regard did not constitute misconduct.

*E. Cumulative Error*

Lockett contends the cumulative effect of the alleged evidentiary and prosecutorial errors compels reversal of his murder conviction. We disagree.

"In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself." (*In re Reno* (2012) 55 Cal.4th 428, 483, superseded by statute on other grounds as stated in *In re Friend* (2021) 11 Cal.5th 720, 728.) However, the rejection of each of a defendant's individual claims "cannot logically be used to support a cumulative error claim [where] we have already found there was no error to cumulate." (*Ibid.*)

Here, there were two grounds on which we found prosecutorial misconduct; however, we concluded no prejudice resulted. Again, given the overwhelming evidence of Lockett's guilt, the aggregate prejudice of these two errors also does not lead us to

conclude Lockett was denied a fair trial. (See *People v. McNally* (2015) 236 Cal.App.4th 1419, 1433 ["Appellant was entitled to a fair trial not a perfect one"].)

*F. Resentencing*

Lockett asks for a remand so the trial court can consider whether to dismiss the firearm sentencing enhancement. We will make that order.

The version of Penal Code section 12022.53 in effect at the time of Lockett's sentencing did not permit the trial court to exercise its discretion to strike or dismiss the firearm enhancement. But since then, the statute has been amended. The law now reads: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (Pen. Code, § 12022.53, subd. (h).)

Here, the trial court imposed a mandatory 25-year firearm enhancement. The Attorney General concedes the newly amended statute applies because it has the potential to lessen the punishment and Lockett's case is not yet final. (See *People v. Francis* (1969) 71 Cal.2d 66, 69-70; *In re Estrada* (1965) 63 Cal.2d 740.) We agree. The court will have an opportunity to exercise its discretion on remand.

III

DISPOSITION

The matter is remanded with directions to the trial court to conduct a new sentencing hearing to consider the firearm sentencing enhancement as discussed.  In all other respects, the judgment is affirmed.


                                    MOORE, ACTING P. J.

WE CONCUR:


FYBEL, J.


ZELON, J.*



*Retired Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

36